We move to the sixth case this morning, this afternoon, U.S. v. Santiago. Mr. Brindley? May it please the Court, my name is Beau Brindley and I represent the defendant appellant Anthony Santiago. Mr. Santiago appeals from the District Court's denial of his motion to suppress Title III wiretap conversations that were based on an application containing a false statement. While this Court has not directly addressed the issue, all the sister circuits that have agree that when dealing with a false statement in an application for a wiretap, the Franks v. Delaware analysis should be applied. And based on that analysis, this case should be remanded for a Franks hearing. Mr. Santiago certainly presented substantial evidence that a false statement was made. An agent told an issuing judge that he was seeking a wiretap from, that he could not identify the primary user of the target phone they wanted to tap. He then went on to tell that same judge that they needed the wiretap expressly to identify that person, when in fact the truth of the matter was that that person was already identified by law enforcement. Testimony at the trial established that a picture of that person, knowing him to be Anthony Santiago, was possessed by law enforcement doing surveillance some week before, on April 3rd. And so they did know who the owner of the phone was, they did know who that person's identity was, and they told the issuing judge they did not. A false statement was shown. The second question is, does Mr. Santiago have substantial evidence of recklessness, at least? And the answer is yes. The same agent who participated in that surveillance, at which Mr. Santiago's ID was known, then wrote a wiretap application to a judge for a phone, talking about the primary user of the phone, and said we can't identify him, we only know him by a nickname, we need a wiretap to identify him. There is no sense in which when you're trying to get a phone, and you know you have a primary user of a phone and you're an agent, there's no sense in which you can say, I didn't realize we'd already identified him, be anything but reckless. Moreover, that same agent on May 10th then tries to get another wiretap application, and in the May 10th application says, we identified Santiago based on that last wiretap in the conversations. Again, that's the same agent making false statements about the same topic in two applications. That's substantial evidence of recklessness, at least from the circumstances that Glover indicated, as we said in our brief, indicates that that's sufficient. The other thing is we have an undeniable material omission, because we know through some unknown means the primary target, user of that phone, was identified. And if we have a material omission, and we have a frank situation, we have to determine materiality, what we have to consider is what the judge was trying to decide. And what he was trying to decide was whether the government had exhausted its standard investigative techniques. But as we note in the brief, when you tell the issuing judge you can't identify the primary target, that leads him to believe undeniably that most of the investigative techniques standardly used are not possible. If you don't know a person's name, you can't do a criminal history check. You can't go out to his house and observe him. You can't find out who his associates are and do interviews and see who will cooperate. They led the issuing judge to believe there was no possibility of doing these things. And by doing that, that is unquestioning material. What did they know? They knew about Salas, right? They knew about the other guy, who was the subject of the first wiretap, the user of the first wiretap, the main user with Salas. And they provided information about their investigative techniques used on Salas. But as some of the sister circuits have noted, you can't impute, Rice in the Sixth Circuit, that case in particular, you can't impute investigative techniques as to one guy to another. You have to be able to say this target phone and the user that we want to intercept, we have exhausted our basic investigative techniques as to him. And they did not. They knew who he was and they didn't do a criminal history. They didn't go to his house. They didn't do a financial circuit. None of the things they said they were trying to do on Salas, they didn't even try those on Santiago. And if we do the Franks analysis and say, yeah, that's material. If you tell him you don't know who it is, and he thinks, the judge that it is, thinks it's not possible to do the analysis or the normal technique, so you don't know who he is and you have to have a wiretap, that impacts his decision on whether you get a wiretap or not. That's obvious. But if you then take the next step under Franks and say, well, let's strike out the false statement and add the materially omitted information. Take out the claim that we need this to identify him and that we can't identify him and put in the omitted information. Judge, we did identify the target user of this phone. That's Anthony Santiago. But we did not then do any investigation of his financial history, his criminal history, his address. We didn't try to talk to him. All of our standard things, we didn't do those after we identified him. Those facts are omitted here. You put that into the wiretap application and every conscientious issuing judge is going to say, go back and do your investigation as to Santiago and then come back to me if you can't get anything from that. And they didn't. All that they say is, well, we did certain things as to Salas, but we don't know who Santiago is. So they can't tell us whether or not the things they did as to Salas would be helpful on Santiago or not. They can't tell the issuing judge that because they're claiming they don't know who he is. And so there's no question that this would have impacted the decision to issue the wiretap. And so he's entitled to a Franks hearing and the case should be remanded at least for that purpose. But I think that when you look at the analysis under 2518, Mr. Santiago is actually entitled to more. Because under Section 2518.1c, it states that the government must provide to the issuing judge a full and complete statement of the investigative techniques used and how they were exhausted. We know that they had, through some unknown technique that we've never been able to find out about, identified Anthony Santiago. They omitted that from their application. That means that as a matter of undeniable logical truth, they did not give the chief judge a full and complete statement of the techniques used and whether or not they were effective. Because some technique was used and some technique was effective and they chose not to tell the judge. Now, under 2518.1c, that means that they violated one of the requirements to get a Title III wiretap application granted. Pursuant to the Giordano case, the violation of a Title III requirement, one of these 2518 requirements, that substantially implements congressional intent to limit the use of these intercepts to only situations where this significant tactic is really necessary. Anytime you have one of the requirements violated that implements that intent of Congress, you have suppression of evidence. When you look at 2518, there is no requirement that is more fundamental to preventing these intercepts from being given in every case as the first step, but 2518.1c that says at least give us a full and complete statement of what you've done and what works. Weren't there a lot of other issues, though, that they would have gained from this wiretap? Not just Santiago, but other activity and stuff that Salas was dealing with. Well, the problem is that what they said they were trying to determine about Salas was Salas' customers, the people associated with Salas' customers, who was buying from him. But when they identified what they'd gotten off of them. But also storage and locations, I suppose. Right. But there's no indication in any of this that a tap on Mr. Santiago's phones would have yielded that. In fact, in the application when they cited the conversations that they had between Salas and Santiago, Santiago only asked Salas questions about certain things. He provided no information. There was no indication that a tap on Santiago's phone was going to give them some sort of broader information about Salas. But all of that gets us away from the important point that when the government is taking the step to include false statements about whether they can identify the main user of a phone in order to get a wiretap, and not telling the court, court, we did have success and we didn't use it. We're not telling you about it. We have successful techniques on this guy. When you do that, that needs to be suppressed. Because otherwise you're going to get a wiretap in every case and everybody's going to get intercepted. It was material to the court's finding. There's no indication it was material to the court's finding. Which court? The reviewing court or the issuing court? Issuing court. There's no way to do that because the issuing court doesn't get to weigh in on this. As they said in Rice, Your Honor, very clearly, you can't give deference to an issuing court when the issuing court has been fundamentally misled about the circumstances. And there's no case that we can find where the government has cited where this has ever happened, where they have a main target user and they falsely say they can't identify him, they need a wiretap to identify him, and then omit facts that they have identified him and don't tell anybody how they did it. When you do that, when you have that extreme situation, there's very few times this is going to be an issue. But when you have these facts, then you have to suppress the evidence. And at the very least, he has to get a Franks hearing so we can get some information about what really happened. Because we still don't know what that technique was. I'll take just a minute to address the identification issue in the Donovan case. We've addressed Donovan. And what Donovan says in its language plainly is that it's talking about failure to fully comply with the identification requirement is not sufficient. It's talking about identifying these other people that will be intercepted that aren't the main target. But in this case, they failed to comply. Not fully. They failed to comply at all. And there is no case that has ever said that if you fail to identify the main target that you're trying to intercept, and in fact make a false statement that you can't identify him and need the tap to do it, when you do that, then we believe that does fundamentally, it's a requirement that substantially implements congressional intent. They have to follow it somewhat. Otherwise, the identification requirement under B-4 is a nullity. It means nothing. Congress put it in there for nothing. But you could also indicate that the government provided enough information and the application indicated it had some idea who Dede was. The government did. Just beyond that. I don't understand. I don't understand. Well, there was more than just, contrary to what you were saying, there was more than just that particular piece you want to suppress this for. Though the application references more things than just Santiago, that's true. But what I'm talking about here is the identification requirement. You have to identify somebody. And if you don't identify the main target, then the identification requirement means nothing. And Congress has put something in there for no purpose, and we don't read statutes that way. With that, Judge, I would ask that we could reserve the remainder of my time for rebuttal. Thank you. May it please the Court. Matthew Madden on behalf of the United States. Your Honor, it was not an abuse of discretion for the Chief Judge to find that necessity was satisfied in this case. To start out with, as this Court has observed in McLee and Thompson and other cases, necessity is not the burden that the defense is portraying here. It's an important requirement. But the way Congress wrote this statute is we only need to show that other investigative procedures reasonably appear to be unlikely to succeed if tried. And in this case, the government not only did that, we actually tried other investigative procedures with one of the most common that we always use is physical surveillance. That was attempted, and it was unsuccessful because the defendant was engaging in counter-surveillance. So we attempted some of the traditional methods of investigation. Those were unsuccessful. And then we laid out the traditional forms of investigation, and the Chief Judge Holderman reasonably concluded that they were unlikely to succeed. Those other methods include some of the obvious ones that we typically engage in, subject interviews, the use of the grand jury subpoenas, search warrants. Interviews were not realistic as laid out in the affidavit because that would let Santiago, Salas, and those people know they are being investigated, and they would flee or destroy evidence. It would ruin our investigation. Grand jury subpoenas were not realistic either because the defendants would take five in the grand jury, and it was not appropriate for us to immunize people who had engaged in significant criminal activity. It was too early for search warrants. We didn't have probable cause, and that would have only led to probably seizure of small amounts of evidence as opposed to allowing us to achieve all of the goals of our investigation. So we tried some investigative measures that were unsuccessful. Others were reasonably deemed to not be likely to succeed. Then the final point that the defense has been focusing on the most is this identification requirement. And that is a requirement of the statute, but it is not as crucial. It is not a crucial requirement the way the defendant has been portraying it here. The premise of his argument is that it is much more difficult to establish necessity when the government actually knows the name of the defendant, and that is simply not true. In this case, if we had, and if the Frank's analysis is typically on materiality, is if you had, if that information was in the affidavit, and it should have been in the affidavit, there was a mistake that was made here, the government should have updated that affidavit to just do a control F and find and replace Fanu Lanu, a.k.a. Titi, and added Anthony Santiago, a.k.a. Titi. If we had done that, there would have been absolutely no impact on probable cause. And that is the Frank's analysis right there. Assuming that Frank's applies to necessity, which this court has not decided, that same change would not have impacted necessity either. We would have still established necessity. And the best evidence of that is the May 11th affidavit, because in preparing for this argument, the one that he's challenging here was the April, I'm sorry, the April 11th affidavit is what he's challenging here, but we obtained a wire run for Santiago and Salas 30 days later. If you compare the necessity sections in those two affidavits, they're very, very similar. The only changes in the later one, and that was also, that's an exhibit to the motion that the defendant initially filed, if you want to take a look at that. The changes to the later one were there was a little bit more surveillance conducted. We attempted to use a tracker and were unsuccessful. And then, of course, Anthony Santiago's name was updated. But all in all, they were very similar. And so if his premise is right, that once you learn a defendant's name, it's nearly impossible or very difficult to establish necessity, he would have attacked that May affidavit, but he hasn't because that premise is not true. The reality is it would not have impacted probable cause if we had added that defendant's name to the affidavit, and it would not have impacted necessity either because just because it's not as though we learn a defendant's name and say, oh, we're done, take out the handcuffs, the investigation's over, because what we wanted were the broad goals of the investigation. We have to, of course, establish proof beyond a reasonable doubt that everyone involved in this drug trafficking organization had engaged in these crimes. That was our main goal. Other goals included, reasonable law enforcement goals included identifying stash houses, where they kept their drugs, where they kept their money, identifying all the people who were involved in the organization, distributing drugs, collecting money, and delivering drugs to customers. We wanted to identify the customers, and we wanted to seize all of that evidence and contraband and prove the charges, and that's why we needed the wire. It was reasonable for the judge to conclude that. It certainly was not abuse of discretion. I'm checking one thing. You mentioned two things. One was tracker and the other is counter surveillance. What is a tracker? A tracker is when law enforcement obtains a court order to place a GPS tracker on a vehicle. I wondered what that was called. Yeah. We later attempted to do that in this investigation on a truck, but we ultimately could not find the truck to put the tracker onto. Do you need a warrant to do that? Yes. We obtained a warrant in this case. Counter surveillance, isn't that an indication they know you're after them? It suggests that. They're at least surveillance conscious. Let me just briefly describe what happened here and what was in the affidavit on that. So law enforcement followed, surveilled Anthony Santiago on three consecutive days in early April prior to applying for this wiretap. On all three occasions, he was interacting with Pedro Salas, who was a known major narcotics trafficker. On one of those occasions, Santiago was on the highway speeding up, slowing down, speeding up, slowing down, swerving lanes, and then right before he got off the expressway, he swerved over three lanes right before the exit. And so the agents viewed that as counter surveillance, meaning that he either suspects he's being followed or he's trying to figure out if he is being followed. That's the only other reason, I guess. Yeah. Zigzagging around. If somebody keeps zigzagging with him, then you figure they're after him. Correct. And so that was something that the chief judge reasonably relied on to determine that other investigative methods had been tried and they were not likely and either were tried or had not been tried, but either way they were unlikely to be successful given what was going on in this investigation. Another point I'd like to make on necessity is the defense claimed that the chief judge couldn't have considered what went on in the broader investigation in addressing necessity, and that's not accurate. It is appropriate and relevant for the chief judge in assessing necessity to look at the broad investigation, not just the conduct of one person. We were investigating a drug trafficking organization. That investigation did not start the day Anthony Santiago first called into a wire phone on Pedro Salas's phone. The investigation started in September of 2011, and we had been investigating, pouring really substantial resources into this investigation, pen registers, surveillance, pings, following people around, and that had started in September of 2011, and it wasn't until April that the government obtained a wiretap on Anthony Santiago's phone. And so what we'd learned was, for example, as set forth in the affidavit, was Salas also engaged in counter surveillance. He delivered some cash to an undercover officer who was posing as a money lender, jumps in a taxi, they follow him. He gets out, runs down a bunch of stairs. Agents are following him, and they see Salas standing at the bottom of the stairs looking to see if anyone's coming down. So the agents, of course, walk right past him and pretend like they're not following him. So they saw that Salas was surveillance conscious, not only of physical surveillance. He was conscious of electronic surveillance. On one of the calls that we set forth, and this is on page 74 and 75 of the wire affidavit that's challenged here, Salas referred on a call to having four radios and three cell phones, which, of course, suggested to us this guy's using as many as seven communications devices. Even though we have a wire, we're only getting a small percentage of his communications. And so that meant that Salas is, of course, aware of potential law enforcement, and he's engaging in counter surveillance both in terms of electronic surveillance and physical surveillance. And so it was relevant for Judge Holderman to see this drug-trafficking organization, the members of it, both Salas and Santiago, they're very surveillance conscious. It has been difficult for the government to crack this case, despite all the investigation that's been done, and it was necessary and appropriate for a wiretap to issue in this case. With regard to 2518, that's what I'm kind of looking for. Is there a threshold that you can invoke there? Obviously, that isn't supposed to be the first step, and I'm not aware very much. I just wondered if the government has a standard. You recited a lot of things that we were trying to find and couldn't do, so you resort to the wiretap in 2518. Is that how it works? Well, so there's necessity, and then there's probable cause. And truthfully, probable cause is extremely difficult to establish, that someone's engaging in crimes, and two, that they're using their phones and furtherance in connection with those crimes, and that we'll be able to intercept those, intercept incriminating communications during the wire period. I think I would say the reality is that probable cause is the very difficult burden for us to meet in these cases, and so a lot of what our investigation is is trying to establish probable cause. And once you've been investigating for a while in probable cause, especially if you're dealing with a large narcotics organization like this where they're engaging in counter-surveillance, necessity is probably going to be established. So what I would say is typically 2518 actually doesn't require any investigation. That's the short answer because of the way it's written is that it just has to be reasonably unlikely to succeed, but we still have the probable cause requirement anyways, which typically requires a substantial investigation to reach that point. Okay. Unless there are any other questions, the government would respectfully request that the court affirm the denial of the motion to suppress. Thank you, Counsel. Thank you. Apparently you didn't have any time left, but I'll give you a minute. Thank you, Your Honor. With respect to the government's comments about all of this analysis they did, the investigation they did on Salas, it is important to say, and the government doesn't dispute, in the case of Lovecure you can't impute investigative techniques done against one person to another. And with respect to Mr. Santiago and what they said in terms of what investigation was done as to him, it was one stretch of surveillance. That's all they did. And had they told the district court the truth, the materially omitted truth that they knew who he was, they didn't check his criminal history, they didn't do anything else with respect to him except one instance of surveillance, Chief Judge Holderman would have told them very likely to go back and do some more. And because of that we know this was material. At the very least he's entitled to a Franks hearing so that issue can be determined. Because this was not just a cut and paste thing. They said we can't identify him and we need the wiretap to identify him. And that was just false. And that left Judge Holderman with the completely wrong impression that none of these techniques could possibly work because they didn't even know the guy is who they were looking for. Thank you, Mr. Frederick. Thank you, Your Honor. Thanks to both counsel and the case is taken under advisement and the court will be in recess.